UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERESA WAGGONER,

    Plaintiff,

v.

CITY OF BATTLE CREEK,

    Defendant.

                                               /

File No. 1:12-CV-827

HON. ROBERT HOLMES BELL

## **OPINION**

This is a gender discrimination case brought under the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 2000e-2, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws 37.2002. The matter is before the Court on Defendant's motion for summary judgment (Dkt. No. No. 41). Plaintiff has filed a response (Dkt. No. No. 50) to which Defendant has filed a reply (Dkt. No. No.51). Given the breadth and depth of the written briefs and evidence presented, the Court holds oral argument is unnecessary for the disposition of the motions. *See* W.D. Mich. LCivR 7.2(d); *see also Himes v. United States*, 645 F.3d 771, 784 (6th Cir. 2011).

Defendant's motion presents two issues for the Court to resolve. First, whether Plaintiff's supervisors, motivated by discriminatory evidence, submitted false or misleading reports about Plaintiff's performance. Second, whether such reports were intended by Plaintiff's supervisors to cause an adverse employment action. Third, whether the submission of such reports was a proximate cause of Plaintiff's termination. Alternatively, whether Plaintiff has established a prima facie case of gender discrimination under the *McDonnell-Douglas* burden shifting framework. Having fully considered the arguments presented, for the reasons that follow, the Court answers these questions in the negative. Consequently, the Court grants Defendant's motion.

## I.

On January 11, 2013, Defendant filed a motion for summary judgment (Dkt. No. No. 8). On April 10, 2013, the Court issued an Opinion (Dkt. No. No. 24) and Order (Dkt. No. No. 25) deferring consideration of Defendant's motion until the close of discovery. The basic facts of this case were described at length in the Opinion (Dkt. No. No. 24 at 1–5). The Court will not repeat the facts here and incorporates its prior discussion by reference. While the disputed facts were laid out with reasonable specificity at the time of Defendant's prior motion, the parties have significantly expanded the record through the course of discovery, and the Court will reference the additional evidence throughout its analysis as needed.

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the moving party will not carry the burden of proof at trial, the party must identify "those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotations omitted). A defendant moving for summary judgment is not required, however, to "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.*

In considering a motion for summary judgment, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas &Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). Nevertheless, the mere existence of a scintilla of evidence in support of a non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

This case involves claims under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act arising from the same set of operative facts. In such a situation, the same set of legal standards are applicable to both claims. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 614 n. 4 (6th Cir. 2003). "'The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination'" *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir.2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). A plaintiff must offer "direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir.2003). Here the parties have presented arguments related to both purported direct and circumstantial evidence of sex-based discrimination. The Court will address these arguments in turn.

A.      **Direct Evidence: "Cat's Paw" Theory of Liability**

In a discrimination case, "direct evidence is proof that, if believed, compels 'the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Here, Defendant argues that direct evidence would be "a statement by a person that an action was taken because of a person's gender . . . There is no such evidence her [sic] of such a statement." (Def.'s Br., Dkt. No. No. 42 at 19.) Plaintiff, however, argues that comments about female drivers made by her supervisor, Debra Crippen, and Crippen's substitute, Scott McKenzie, show direct evidence of discriminatory animus that led to Plaintiff's discharge. (Pl.'s Resp., Dkt. No. No. 50 at 6.) Crippen and McKenzie, however, were not the ultimate decision-makers with regard to Plaintiff's continuing employment and Defendant ultimately terminated Plaintiff on the recommendation of Richard Werner.

When a supervisor with alleged discriminatory animus is not the ultimate decision-maker, a plaintiff can still demonstrate discrimination with direct evidence by establishing a "'causal nexus' between the ultimate decision-maker's decision to [terminate] the plaintiff and the supervisor's discriminatory animus." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 677 (6th Cir. 2008)). One way to establish this nexus is by presenting evidence of "cat's paw" liability. *Chattman*, 686 F.3d at 551.[1]

---

[1]The term "cat's paw" was introduced to the legal lexicon by Judge Posner in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The term comes from one of Æsop's fables in which a clever monkey entices a cat into retrieving roasting chestnuts from a fire, only to steal the nuts and leave the cat with nothing but a burnt paw. The term is shorthand for one who uses another as a means to accomplish an unsavory task.

The Supreme Court held that cat's paw liability is established when "a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, ___ U.S. ___, ___, 131 S. Ct. 1186, 1194 (2011). An employer still may be liable, even if it conducts an independent investigation. *Id.* at 1193. "[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Id.* The biased report of the supervisor "may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*; *see also Shazor v. Prof'l Transit Mgmt., Ltd.*, No. 13-3253, 2014 WL 627406, at *6 (6th Cir. Feb 19, 2014); *Chattman*, 686 F.3d at 350–52.

Plaintiff argues that her supervisor, Debra Crippen, and Crippen's substitute, Scott McKenzie, harbored discriminatory animus toward women and that they—motivated by that animus—submitted "false and misleading" reports to those with the authority to fire Plaintiff for the purpose of having Plaintiff fired. (Resp., Dkt. No. No. 50 at 6.) Specifically, Plaintiff alleges that: (1) Crippen "made clear that she . . . wanted to hire male drivers instead of [Plaintiff]." (*id.* at 5); (2) Crippen referred to other female drivers as, "'bitches', 'stupid bitches', and 'typical niggers.'" and made other comments derisive of minority female drivers (*id.*); (3) Crippen "told [Plaintiff] that men are 'easier to train,' did not get into 'cliques,' and did what they were told to do." (*id.* at 6); (4) Crippen told Plaintiff on her second day that "she never wanted [Plaintiff] hired" and that Plaintiff "wouldn't make it through probation." (*id.* at 9); (5) Crippen did not want to hire Plaintiff because she wanted to hire two men, but could not because their references were bad (*id.*); (6) Plaintiff

5

received inadequate training, and specifically never drove the Northeast Capital route during training (*id.*); (7) McKenzie stated that Defendant would not be hiring a woman for the open position (*id.* at 13); (8) McKenzie observed the two other probationary trainees[2] make mistakes similar to Plaintiff, but did not recommend those trainees be terminated (*id.* at 13); (9) McKenzie stated that "If we are going to let someone go, it's going to be a woman." (*Id.* at 26; Op., Dkt. No. No. 24 at 3); (10) Crippen fabricated accounts of Plaintiff's insubordination, particularly with respect to her wheelchair training (Pl.'s Resp., Dkt. No. No. 50 at 27); (11) Crippen selectively edited a video of Plaintiff smoking at the entrance of a bus "so that Werner would not see [Plaintiff] putting out the cigarette" (*id.*); (12) Crippen did not report to Werner that she and others had smoked in close proximity to the bus without consequence (*id.*); (13) Crippen falsely reported to Wagner that Plaintiff had driven the Northeast Capital route on several occasions (*id.*); (14) Crippen failed to report that the trainees were allowed to talk with each other and with passengers during training (*id.*); (15) Crippen failed to report that "she and others had let persons off at non-stops when there was a compelling reason to do so" (*id.*); (16) McKenzie falsely reported to Crippen that Plaintiff almost ran a red light, and failed to report that another female trainee "almost sailed through a light" (*id.* at 28); and (17) both Crippen and McKenzie exaggerated or falsified Plaintiff's allegedly immature behavior, such as making braking and accelerating noises while driving (*id.*)

    Plaintiff's argument boils down to the following three points: (1) there are genuine fact issues concerning Crippen and McKenzie's discriminatory animus; (2) there are genuine fact issues about the truthfulness of reports Crippen and McKenzie made to those with authority to terminate Plaintiff; (3) there are genuine fact issues regarding whether Crippen and MacKenzie's reports were a proximate cause of Plaintiff's discharge.

---

[2] Sheldon Williams (male) and Marcia Govier (female). *See* Opinion, Dkt. No. No. 24 at 2.)

1. Discriminatory Animus

There is an issue of fact as to whether Crippen made statements that women were "bitches", "stupid bitches", harder to train than men, or that she would have preferred to hire two men rather than Plaintiff. Plaintiff testified in her depositions and affidavits that Crippen made such statements in her presence. This evidence is contradicted by evidence submitted by Defendant, notably the affidavit of Plaintiff's fellow trainee Marcia Govier, who testified that she never heard Crippen make such statements. (Dkt. No. No. 42-1.) Nevertheless, Plaintiff's affidavit, pertaining to events of which she has personal knowledge, is sufficient to create a triable issue of fact as to whether Crippen made such statements. *See, e.g., Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010).

McKenzie made an isolated statement to the trainees about needing to hire male drivers instead of females. McKenzie admits making this statement, and Defendant argues that it was made in the context of McKenzie joking around with the trainees. This contention is underscored, Defendant argues, by the fact that all three trainees had already been hired, and merely needed to pass probation in order to keep their jobs. Plaintiff argues, however, that McKenzie gave her an "evil grin" after making this statement and that Plaintiff understood McKenzie to mean that she would not pass probation.

Viewing these statements in the light most favorable to Plaintiff, they might be direct evidence of discriminatory animus. In *Chattman*, a supervisor made several baldly racist jokes and comments. *Chattman*, 686 F.3d at 343. The court held that "no inference is required to gleam from those statements that [the supervisor] harbored racial animus towards African Americans." *Id.* at 347. However, in *Shazor*, when analyzing e-mails between supervisors allegedly showing discriminatory animus based on gender, the court stated:

7

> One of these e-mails unambiguously reveals sexist animus—Scott's statement that Plaintiff was "one hellava bitch." But the other e-mails are more veiled. . . Viewed as a whole, Setzer's and Scott's correspondence might only show "occasional[ ]" sexist and racist comments, which would not be enough to establish direct evidence of discriminatory intent.

*Shazor*, 2014 WL 627406, at *7 (internal citations omitted).

Likewise the sexist comments Plaintiff alleges she heard seem to be of the type in *Shazor*. While there is an undercurrent of sexist animus, when taken together with the entire record of Plaintiff's interactions with Crippen and McKenzie, the comments "might only show 'occassional[]' sexist . . . comments" that are insufficient to establish direct evidence of discriminatory intent. *See Shazor*, 2014 WL 627406, at *7. Even though, based on the dicta in *Shazor*, Plaintiff might have shown discriminatory animus on the part of Crippen and McKenzie, she has failed to provide direct evidence that "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in her firing. *Weberg v. Franks*, 220 F.3d 514, 524 (6th Cir. 2000). Rather, the conclusion that Crippen or McKenzie's animus, if any, was a motivating factor, would require an inference on the part of the fact finder. *See Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999) (holding that direct evidence must prove a fact without inferences or presumptions); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) ("Direct evidence of discrimination is the equivalent of an employer stating 'I fired you because you are disabled.'"). Because Plaintiff has failed to offer direct evidence that Crippen and McKenzie's reports were motivated by discriminatory animus, there is no genuine issue of *material* fact on this issue.

2.  <u>Crippen and McKenzie's Reports</u>

Plaintiff's direct evidence theory fails for a second, independent reason. Plaintiff argues that her "openly biased supervisors have submitted false or misleading" reports that led to her

termination. (Pl.'s Resp., Dkt. No. No. 50 at 6.) Plaintiff argues that Crippen and McKenzie's reports that she:

(1) made braking and acceleration noises while driving;

(2) wandered off during safety training;

(3) did not remember routes, missed stops on routes, missed turns, almost ran a red light, failed to drop a customer off at his stop, and was easily distracted;

(4) wore shoes not approved as part of her uniform;

(5) repeatedly opened the bus door by letting her knee hit a switch;

(6) took excessive breaks;

(7); engaged in excessive conversation; and

(8) drove too close to the side of the road

were either wholly inaccurate or selectively reported negative facts about her while leaving out positive attributes of her performance. (*See generally* Ex. 11, Dkt. No. No. 44-1; Ex. 12, Dkt. No. No. 44-2.) Plaintiff disagrees with nearly every contention of Crippen and McKenzie's reports, or alternatively offers differing explanations for her actions.

For example, one incidence of alleged insubordination occurred when Crippen was training Plaintiff and other probationary employees on how to properly secure a wheelchair. Plaintiff describes the incident as follows:

> [Plaintiff] was standing outside the coach looking directly at Crippen as she demonstrated how to strap the chair down. Soon, however, [Plaintiff] felt a rumbling in her stomach and moved about ten feet away because she had to relieve the gas pressure building up inside her. She did and then returned immediately to the door. When Crippen asked where she had been, [Plaintiff] asked Crippen if she wanted the truth. When Crippen said that she did, [Plaintiff] said she had moved because she had to fart, at which point everyone burst into laughter []. [Plaintiff] then took her turn strapping down the wheelchair, fastening it in the way that she had always done in

9

Harper Creek[3]. When Crippen told her that was not the way she wanted it done, [Plaintiff] complied, even though she believed that the Harper Creek method was safer []．

(Resp., Dkt. No. No. 50 at 11.) Crippen testified that Plaintiff wandered off during wheelchair training and offered no explanation for why she was not paying attention. Crippen further avers after Plaintiff stated she knew how to attach a wheelchair, Plaintiff attached it unsafely.

Plaintiff also attempts to call into question Crippen's credibility by pointing to alleged discrepancies in her testimony regarding McKenzie's report to her about Plaintiff's alleged job deficiencies. (*Id.* at 15.) She also argues with regard to Crippen's ride-along with Plaintiff that "Crippen has given three different descriptions of what happened on the day that [Plaintiff] cried that are so widely divergent that they raise the inference that she is not telling the truth about anything." (*Id.* at 17.) Plaintiff focuses on alleged inconsistencies in Crippen's testimony as to when Plaintiff broke down and cried during training. (*Id.* at 16–18.)

According to McKenzie's report, Plaintiff made numerous mistakes while under his supervision. Plaintiff alleges that during this time, she and the other trainees made similar mistakes "because they [were] new." (Pl.'s Resp., Dkt. No. No. 50 at 13.) Plaintiff further alleges that Williams hit a curb and nearly ran a red light and that Govier failed to call out ADA stops and locked up her brakes. (*Id.*) Plaintiff argues that McKenzie singled her out for Crippen's scrutiny by selectively reporting her mistakes, while covering up the mistakes of the other trainees. (*Id.* at 14–15.) Moreover, Plaintiff argues that McKenzie fabricated the mistakes she made in order to get her fired. (*Id.*)

McKenzie reported that during one training route, among other things, Plaintiff kept allowing her knee to strike the switch that activates the automatic bus doors. In her brief Plaintiff argues that

---

[3]Plaintiff previously was a part-time bus driver for Harper Creek Community Schools. (Pl.'s Resp., Dkt. No. No. 50 at 7.)

"because she is 6'4" tall, her legs could not fit into the driving area of one of the older coaches." (*Id.* at 14.) Plaintiff does not contradict, however, McKenzie's report that after a third verbal reprimand, she was able to avoid opening the door with her knee again for the remainder of the driving exercise. (Def.'s Ex. 11, Dkt. No. No. 44-1.)

Throughout her brief, Plaintiff puts great emphasis on the "false" and "misleading" nature of the reports. In fact, Plaintiff argues that a necessary element of cat's paw liability is that the reports of the discriminatory supervisor be false or misleading. (Pl.'s Reps., Dkt. No. No. 50 at 23.) This, however, is not the state of the law. *Staub*, *Shazor*, and *Chattman* all outline the contours of cat's paw liability, but no case stands for the proposition that a biased supervisor must lie to or mislead someone with authority to take adverse employment action in order for the employer to be liable. Therefore, the Court need not reach the issue of whether the reports submitted by Crippen (Def.'s Ex. 12, Dkt. No. No. 44-2) and McKenzie (Def.'s Ex. 11, Dkt. No. No. 44-1) are false and misleading, but rather, must decide if a genuine issue of fact remains as to whether those reports were the proximate cause of Plaintiff's termination. *See Chattman*, 686 F.3d at 350.

3. <u>Proximate Cause</u>

In order for liability to attach to an employer under a cat's paw theory, the action of a supervisor, motivated by a discriminatory animus, must be a proximate cause. *Shazor*, 2014 WL 627406, at *6. The biased action of an intermediate supervisor, however, "need not be the sole cause of the adverse action." *Chattman*, 686 F.3d at 352. An employer is not liable, however, "if 'the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action.'" *Id.* (quoting *Staub*, 131 S.Ct. at 1193). An independent investigation by the employer is not a per se defense, however. *Id.* In order to escape liability, the employer must

determine that the adverse action is, "apart from the [biased] supervisor's recommendation, entirely justified." *Id.* (quoting *Staub*, 131 S.Ct. at 1193).

Here, although the Court has determined that Plaintiff has failed to raise a genuine fact issue as to whether Crippen and McKenzie were motivated by discriminatory animus, the Court further holds that Plaintiff has failed to raise a genuine fact issue as to whether her supervisors' alleged discriminatory actions were a proximate cause of her termination.

Defendants have presented evidence of an independent investigation. Crippen saved portions of a video recording made by the on-board camera system on the bus Plaintiff drove carrying paying passengers, without supervision. (*See* Opinion, Dkt. No. No. 24 at 4.)

> [W]hen Crippen watched the video the next day, it showed Plaintiff engaging in a twelve minute long conversation with passengers (a safety risk), making sound effects, missing stops when requested by passengers and then blaming the passengers, missing Americans with Disability Act required call-outs of upcoming stops, and stopping in a location not authorized as a bus stop. Werner also reviewed this video and noticed the same violations.

(*Id.*) In fact, Werner testified further, stating that he was the ultimate decision-maker as to whether to hire Plaintiff as a full time employee (Werner Aff., Dkt. No. No. 9-1 ¶ 4), and that he reviewed the video of Plaintiff's driving himself. (*Id.* ¶ 16.) Werner testified that both Crippen and McKenzie had come to him with their concerns about Plaintiff's performance prior to his viewing of the video. (*Id.* ¶ 12.) When Werner watched the video, he observed the same troubling behavior as Crippen, as described above. (*Id.* ¶ 16.) On his decision to terminate Plaintiff, Werner stated:

> Notwithstanding Plaintiff's poor performance during training, I would have terminated any probationary Coach Operator based alone on the twelve-minute nearly continuous conversation with the passenger because of the danger that such a distraction presents to passengers, which was likely the cause of Plaintiff missing stops and running the stop sign.

(*Id.* ¶ 19.)

Plaintiff argues that the video shows that she only had an "intermittent conversation" with a passenger, that she never received training to avoid excessive talking with passengers, and that other trainees spoke with passengers during training routes. (Pl.'s Resp., Dkt. No. No. 50 at 20–21.) Plaintiff's arguments lack merit. First, whether the conversation was intermittent or continuous, Werner in his independent judgment found it serious enough to warrant termination. Second, Plaintiff's assertion that she never received training on conversations is belied by the fact that she placed her initials on a training log stating that she had received the employee manual. (Def.'s Ex. 13, Dkt. No. No. 44-3.) That manual states, "Although you want to b e pleasant, try to avoid too much conversation with the passengers. This is sometimes hard to do, but too much conversation can distract you and create a safety problem." (Def.'s Ex. 4, Attachment E, Dkt. No. No. 9-4 at 27.) Finally, the record establishes that the incidents Plaintiff reports when other trainees spoke to passengers occurred when the trainees themselves were riding the bus while another trainee drove.

In sum, Plaintiff has failed to present evidence that would create a genuine fact issue as to whether the allegedly biased acts of Crippen and McKenzie were a proximate cause of her termination. Rather, Defendant has established that after an independent investigation, Werner decided to terminate Plaintiff based on her poor performance and behavior that endangered passenger safety. Defendant is therefore entitled to summary judgment on Plaintiff's direct evidence theory of liability.

**B.     Circumstantial Evidence: *McDonnell Douglass* burden-shifting framework**

Even if a plaintiff dos not have direct evidence of gender discrimination, she can prevail on a Title VII case by presenting circumstantial evidence of discrimination. Title VII claims based on circumstantial evidence are evaluated under the familiar *McDonnell Douglas* burden shifting

framework. *Serrano v. Cintas Corp.*, 699 F.3d 844, 892 (6th Cir. 2012). First, a plaintiff must present a prima facie case of discrimination. *Id.* at 893. If the plaintiff is successful, the burden then shifts to the defendant to show a non-discriminatory reason for the adverse employment action. *Id.* Finally, if the defendant shows a non-discriminatory reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for illegal discrimination. *Id.* Here, because Plaintiff cannot establish a prima facie case, Defendant is entitled to summary judgment.

To establish a prima facie case, Plaintiff must present "evidence from which a jury could find that '(1) [plaintiff] is a member of a protected class; (2) [plaintiff] was qualified for [the] job; (3) [plaintiff] suffered an adverse employment decision; and (4) [plaintiff] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.' *Id.* (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Defendant argues that Plaintiff cannot establish a prima facie case because she is not qualified for the job of a bus driver, therefore failing to meet the second prong of the *McDonnell Douglas* standard. (Def.'s Br., Dkt. No. No. 42 at 20.) Plaintiff does not respond to these arguments in her brief, preferring to focus on direct evidence, as discussed above.

To be qualified for a job, the plaintiff must show she was performing her job "at a level that met [her] employer's legitimate expectations." *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991) (internal citations omitted). Further, a plaintiff's mere disagreement with her supervisor's judgment of the quality of her work does not raise a genuine issue of material fact. *Id.* Defendant has produced voluminous evidence that Plaintiff's work as a bus driver fell below the legitimate expectations of her supervisors. This evidence is rebutted only by Plaintiff's disagreement

with her supervisor's judgment. Such is insufficient to raise a genuine fact issue. As just one example, Plaintiff's unsafe, continuous conversation while driving her route, video of which the Court has reviewed, demonstrates that she was not qualified for her job. Plaintiff therefore cannot establish a prima facie case of discrimination, and summary judgment in favor of Defendant is appropriate.

Even if Plaintiff could establish a prima facie face, Defendant has offered extensive proofs as to a non-discriminatory reason for Plaintiff's firing: namely, that she was insubordinate and her driving habits created a safety hazard for Defendant's passengers.

Finally, the Court is convinced that Plaintiff cannot establish that Defendant's proffered reason for her termination is pretextual. This conclusion is undergirded by the fact that one of Plaintiff's co-trainees, Marcia Grover, is also female. Grover successfully completed her probationary period of employment, and as of the date of her affidavit was still an employee of Defendant. Further, after the probationary period ended, Plaintiff's other co-trainee, Sheldon Williams, resigned. Plaintiff and Williams's positions were ultimately filled by a man and a woman. No reasonable jury could find that Defendant's proffered reason for firing Plaintiff was a pretext for gender-based discrimination when Defendant retained one female bus driver and hired another. Therefore, Defendant is alternatively entitled to summary judgment on a circumstantial evidence theory of liability.

## III.

For the foregoing reasons, the Court holds there are no genuine issues of material fact with regard to Plaintiff's claims under Title VII of the Civil Rights Act of 1964 or Michigan's Elliot-Larsen Civil Rights Act. The Court will therefore enter summary judgment in favor of Defendant.

The Court will issue an Order consistent with this Opinion.

Dated: <u>March 28, 2014</u>　　　　　　　　　　　/s/ Robert Holmes Bell　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　ROBERT HOLMES BELL
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE